# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| KRISTEN CARLYON, | Case No. 1:16-cv-00861 |
| Plaintiff, | **COMPLAINT FOR DAMAGES UNDER THE FAIR DEBT COLLECTION PRACTICES ACT, THE TELEPHONE CONSUMER PROTECTION ACT AND OTHER EQUITABLE RELIEF** |
| v. | |
| I. C. SYSTEM, INC., | |
| Defendant. | **JURY DEMAND ENDORSED HEREIN** |

## PARTIES

1. Plaintiff, Kristen Carlyon ("Kristen" or "Plaintiff"), is a natural person who resided in Pflugerville, Texas, at all times relevant to this action.

2. Defendant, I. C. System, Inc. ("ICS" or "Defendant"), is Minnesota Corporation that maintained its principal place of business in St. Paul, Minnesota, at all times relevant to this action.

## JURISDICTION AND VENUE

3. Pursuant to 28 U.S.C. § 1331, this Court has federal question jurisdiction over this matter as it arises under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692, *et seq*., and the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

4. Pursuant to 28 U.S.C. § 1391(b), venue is proper because a substantial part of the events giving rise to this claim occurred in this judicial district.

## STATEMENT OF FACTS

5.   Before ICS began contacting Kristen, it and Kristen had no prior business relationship and Kristen had never provided express consent to ICS to be contacted on her cellular telephone.

6.   ICS regularly uses instrumentalities of interstate commerce and the mails to collect consumer debts owed or due or asserted to be owed or due another.

7.   The principal source of ICS's revenue is debt collection.

8.   ICS is a "debt collector" as defined by 15 U.S.C. § 1692a(6).

9.   As described, *infra*, ICS contacted Kristen to collect a debt that was incurred primarily for personal, family, or household purposes.

10.   This alleged obligation is a "debt" as defined by 15 U.S.C. § 1692a(5).

11.   Kristen is a "consumer" as defined by 15 U.S.C. § 1692a(3).

## LEGAL CONTEXT OF ICS'S CALLS TO KRISTEN

12.   The Attorney General for the State of Texas (the "Attorney General") has repeatedly warned Texas consumers to be on guard against unsolicited calls from unknown entities that request personal information without revealing the nature or purpose of the calls.

13.   For example, Attorney General's website states the following regarding "Phishing" (one of the Attorney General's "Top Ten Frauds and Scams"):

> **Phishing.** No matter what they say, when they call or email wanting you to give them your social security, credit card, or bank account number, DON'T DO IT. Not for any reason, no matter who they say they are or why they say they need it. They will steal your identity (and your money).[1]

---

[1] *See https://texasattorneygeneral.gov/cpd/top-ten-frauds-and-scams.*

14.   Similarly, the Attorney General's website states the following regarding "Preventing

Identity Theft":

> Do not give sensitive information to unsolicited callers. Legitimate businesses will not make unsolicited calls asking for your Social Security or bank account numbers. Caller ID information can be spoofed, so do not rely on the name and number that is on your box.[2]

15.   Similarly, the Federal Trade Commission has publicly warned:

> If you get a call from someone you don't know who is trying to sell you something you hadn't planned to buy, say "No thanks."   And, if they pressure you about giving up personal information – like your credit card or Social Security number – *it's likely a scam.*  Hang up and report it to the Federal Trade Commission.
>
> * * *
>
> Everyone's a potential target…Keep your credit card, checking account, or Social Security numbers to yourself.  *Don't tell them to callers you don't know – even if they ask you to "confirm" this information.  That's a trick.*"[3]

16.   In addition, the Office of the United States Inspector General has warned consumers,

"**<u>never</u>** provide your personal information when receiving unsolicited calls or contacts."[4]

17.   Within the last eighteen (18) months, an account in the name "Kristen Carlyon" was placed

with ICS for collection.

18.   The account data provided to ICS identified an individual named "Kristen Carlyon" as the

person who allegedly owed the outstanding debt on the account.

19.   In addition, the account data provided ICS with a telephone number ending in -3907, which

according to the original account holder, belonged to the alleged debtor, "Kristen Carlyon."

---

[2] *See* https://www.texasattorneygeneral.gov/identitytheft/preventing-identity-theft.
[3] *See* www.consumer.ftc.gov/articles/0076-phone-scams (emphases added).
[4] *See* oig.ssa.gov/newsroom/news-releases/may3advisory (emphasis included).

*ICS's Calls to Kristen*

20. Against this backdrop, in mid-2016, ICS began calling Kristen on Kristen's cellular telephone number ending in -3907 in connection with the collection of a debt.

21. Shortly after the calls began, Kristen answered ICS's call and said, "hello."

22. The ICS agent asked to speak with "Kristen Carlyon," and Kristen confirmed that she was the person with whom ICS was looking to speak.

23. The ICS agent then asked Kristen to provide or verify the last four (4) digits of her Social Security Number.

24. Kristen declined to provide or verify the personal information requested by ICS and instead inquired as to the nature and purpose of the call.

25. The ICS agent refused to disclose the nature and purpose of the call unless Kristen first provided or verified the last four (4) digits of her Social Security Number.

26. Once again, Kristen declined to provide or confirm the personal information requested by ICS without first knowing the nature and purpose of the call.

27. The ICS agent again refused to disclose the nature and purpose of the call.

28. At that point, Kristen expressed frustration with the ICS agent and terminated the call.

29. Thereafter, on multiple occasions, ICS called Kristen on Kristen's cellular telephone number ending in -3907 in connection with the collection of a debt.

30. On multiple occasions, Kristen answered ICS's call and said, "hello."

31. On each occasion, ICS asked to speak with "Kristen Carlyon," and Kristen confirmed that she was the person with whom ICS was looking to speak.

32. On each occasion, ICS asked Kristen to provide or verify the last four (4) digits of her Social Security Number.

33. On each occasion, Kristen declined to provide or confirm the personal information requested by ICS without first knowing the nature and purpose of the call.

34. On each occasion, Kristen expressed frustration with the ICS agent over ICS's continued calls and its insistence that Kristen provide or verify the last four (4) digits of her Social Security Number before ICS would reveal the nature and purpose of the call.

### *ICS's Debt Collection Practices*

35. A debt collector's intent to violate the FDCPA may be inferred by its maintenance of policies and procedures which, in themselves, violate the FDCPA. *See Anchondo v. Anderson, Crenshaw & Associates, L.L.C.,* 256 F.R.D. 661, 671 (D.N.M. 2009); s*ee also Kromelbein v. Envision Payment Sol., Inc.*, 2013 WL 3947109, *7 (M.D. Penn. Aug. 1, 2013)("company policy can be just as much a violation of [FDCPA] as the rogue act of an individual employee.  If anything, a company policy that violates the FDCPA is a more egregious transgression because it indicates endemic, rather than isolated, disregard for debtor rights."); *citing Edwards v. Niagara Credit Sol., Inc.*, 586 F. Supp. 2d 1346, 1354 (N.D. Ga. 2008) (awarding maximum damages in part because conduct was company policy, thereby making it routine and frequent).

36. ICS regularly engages in a debt collection practice whereby it requires a consumer to provide or confirm personal information about himself or herself after the consumer has already identified himself or herself as the person with whom ICS is looking to speak.

37. Under ICS's debt collection practice, if the consumer identifies himself or herself, but does not provide or confirm the additional personal information requested, ICS refuses to disclose the nature and purpose of the call.

38.  Under ICS's debt collection practice, if the consumer identifies himself or herself, but does not provide or confirm the additional personal information requested, ICS does not record the substance of the conversation in its account notes or flag the account for no further calls.

39.  Under ICS's debt collection practice, if a consumer previously identified himself or herself, but declined to provide or confirm the additional personal information requested, ICS will continue to call the consumer and demand that the consumer provide or confirm the same personal information that the consumer previously declined to provide or confirm.

40.  When ICS continues to call a consumer who previously spoke with ICS and declined to provide his or her personal information, the consumer has reason to fear that when ICS continues to call, it will once again demand that the consumer provide additional personal information without revealing the purpose of the call.

41.  The consumer also has reason to fear that ICS may be attempting to perpetrate a fraud, a scam, or a crime on the consumer.

42.  ICS's debt collection practices needlessly frustrate, harass, and intimidate consumers by pressuring them to disclose or confirm personal information, which they are reasonably reluctant to provide or confirm without first knowing the nature and purpose of the call.

43.  ICS followed the above-described debt collection practice in its attempts to collect a debt from Kristen.

### *Kristen's Communication of Her Desire that Medicredit Cease Calling*

44.  In order to establish a violation of the FDCPA, a consumer need not prove intentional conduct by the debt collector.  *See Ellis v. Solomon & Solomon, P.C.*, 591 F.3d 130, 135 (2nd Cir. 2010); *Horkey v. J.V.D.B. & Assocs., Inc.*, 333 F.3d 769, 774 (7th Cir. 2013)

("[Plaintiff] points to no evidence in the record regarding [Defendant's] intent, which is just as well, because intent is irrelevant" in a § 1692d claim).

45. "Instead, applying an objective standard, as measured by the 'least sophisticated consumer,' the consumer need only show that the likely effect of the debt collector's communication or conduct could be construed as harassment, oppression or abuse." *See Lee v. Credit Mgmt., LP*, 846 F. Supp. 2d 716, 721 (S.D. Tex. 2012).

46. Courts have established that, under the "least sophisticated consumer" standard, the consumer is not required to assert his or her rights in legally precise terms. *See Horkey*, 333 F.3d, at 773.

47. Instead, the consumer need only say *something* to put the debt collector on notice that the consumer feels harassed by the debt collector's call or continued calls. *See Sellers v. State Collection Serv., Inc.*, 2016 WL 1179231, *3 (W.D. Wis. Mar. 24, 2016)

48. During Kristen's conversations with ICS, Kristen made clear that before she would provide or confirm the personal information ICS was requesting, Kristen first wanted to know the nature and purpose of the call.

49. In so doing, Kristen communicated her desire that ICS cease calling her if ICS was going to continue demanding that Kristen provide or confirm personal information before ICS would disclose the nature and purpose of the call.

50. In addition, Kristen communicated that she felt harassed and annoyed by ICS's continued calls and its relentless insistence that Kristen provide or confirm personal information without disclosing the nature and purpose of the call.

*Article III Standing*

51.  ICS's collection efforts, including but not limited to its telephone calls, caused Kristen emotional distress in the form of frustration, annoyance, aggravation, and anxiety.

52.  ICS's collection efforts also intruded upon Kristen's privacy.

53.  In addition, each time ICS placed a telephone call to Kristen, ICS occupied Kristen's telephone number such that Kristen was unable to receive other phone calls at that telephone number while ICS was calling her.

54.  ICS's telephone calls also forced Kristen to lose time by having to tend to ICS's unwanted calls.

**COUNT ONE**

**Violation of the Fair Debt Collection Practices Act**

55.  Kristen re-alleges and incorporates by reference Paragraphs 5 through 54 above as if fully set forth herein.

56.  ICS violated 15 U.S.C. § 1692d by engaging in conduct the natural consequence of which is to harass, oppress, or abuse Kristen in connection with the collection of the debt.

**COUNT TWO**

**Violation of the Fair Debt Collection Practices Act**

57.  Kristen re-alleges and incorporates by reference Paragraphs 5 through 54 above as if fully set forth herein.

58.  ICS violated 15 U.S.C. § 1692f by using unfair or unconscionable means to collect the debt.

## COUNT THREE

### Violation of the Telephone Consumer Protection Act

59.   Kristen re-alleges and incorporates by reference Paragraphs 5 through 54 above as if fully set forth herein.

60.   Senator Fritz Hollings, the original sponsor of the TCPA, stated:

> Computerized calls are the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall.

137 Cong. Rec. 30,821 (1991).

61.   The TCPA defines an automatic telephone dialing system ("ATDS") as "equipment which has the capacity…(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1).

62.   "[A] predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls.  The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers."  *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 7973, ¶ 13 (2015); *see also In the Matter of Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C. Rcd. 14014, 14091-4093 (2003); *In the Matter of Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 F.C.C. Rcd. 559, 562-63 (2008).

63.   A predictive dialer is an ATDS within the meaning of the TCPA. *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC

Rcd. 7961, 7973, ¶ 13 (2015); *see also In the Matter of Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C. Rcd. 14014, 14091-4093 (2003); *In the Matter of Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 F.C.C. Rcd. 559, 562-63 (2008).

64.   The TCPA provides, in part:

>   (b)  RESTRICTIONS ON THE USE OF AUTOMATED TELEPHONE EQUIPMENT.—
>
>>   (1) PROHIBITIONS.—It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—
>>
>>>   (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—
>>>
>>>   * * *
>>>
>>>>   (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call…

47 U.S.C. §§ 227(b)(1)(A)(iii).

65.   The term "called party," as used in Section 227(b)(1)(A) of the TCPA, refers to the subscriber or the regular user of the called number at the time the telephone call is made. *See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling and Order, adopted June 18, 2015, pp 40-41, ¶¶ 72-73.

66.   Kristen was the "called party" in each telephone call ICS placed to a Kristen's cellular telephone.

67.    Under the TCPA, a "called party" is permitted to revoke consent "in any reasonable manner" without necessarily using the words, "cease calling me," or "stop calling me." *See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 8010, ¶ 91 (2015); *see also Brown v. Credit Mgmt., LP*, 131 F. Supp. 3d 1332, 1345 (N.D. Ga. 2015)  ("The unwillingness [to receive calls] 'may be manifested to the actor by any words or conduct inconsistent with the continued consent.'")

68.    By refusing to provide or confirm the personal information requested by ICS and refusing to speak with ICS if it would not reveal the nature and purpose of the call, Kristen revoked her consent to be called "in a reasonable manner" as permitted by the TCPA.

69.    By refusing to provide or confirm the personal information requested by ICS and refusing to speak with ICS if it would not reveal the nature and purpose of the call, Kristen's words and conduct were inconsistent with "continued consent" to be called under the TCPA.

70.    ICS violated 47 U.S.C. § 227(b)(1)(A) on multiple and separate occasions by each time using an ATDS and/or an artificial or prerecorded voice to call Kristen on her cellular telephone without Kristen's prior express consent or after such consent had been revoked.

71.    In addition, The TCPA provides, in part:

> If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

47 U.S.C. § 227(b)(3).

72.    The Communications Act of 1943, of which the TCPA is a part, defines "willful" as "the conscious or deliberate commission or omission of such act, irrespective of any intent to violate any provision[], rule or regulation...."  47 U.S.C. § 312(f).

73. In order to establish a "willful" or "knowing" violation of the TCPA, a plaintiff need not demonstrate that the defendant intended to violate the statute, or that it knew or should have known it was violating the statute. *See Roylance v. ALG Real Est. Servs., Inc.* 2015 WL 1522244, *9 (N.D. Cal. Mar. 16, 2015); *Bridgeview Health Care Ctr. Ltd. v. Clark*, 2013 WL 1154206, *7 (N.D. Ill. Mar. 19, 2013); *Stewart v. Regent Asset Mgmt. Solutions, Inc.*, 2011 WL 1766018, *7 (N.D. Ga. May 4, 2011).

74. Instead, a plaintiff need only show that the defendant engaged in a "voluntary act" that violated the TCPA. *See Bridgeview*, 2013 WL 1154206, at *7; see also *Roylance*, 2015 WL 1522244, at *9 (intentionally making phone calls that violated TCPA, without intent to violate the statute, was sufficient to warrant treble damages).

75. ICS voluntarily placed telephone calls to Kristen's cellular telephone number using an ATDS and/or an artificial or prerecorded voice.

76. ICS's violations of 47 U.S.C. § 227(b)(1)(A) were willfully and knowingly made.

## JURY DEMAND

77. Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

78. Plaintiff prays for the following relief:

   a. Judgment against Defendant for actual damages, statutory damages, and costs and reasonable attorney's fees pursuant to 15 U.S.C. § 1692k.

   b. An order enjoining Defendant from placing further telephone calls to Plaintiff's cellular telephone number pursuant to 47 U.S.C. § 227(b)(3).

   c. Judgment against Defendant for statutory damages pursuant to 47 U.S.C. § 227(b)(3) for each and every call Defendant made in violation of the TCPA.

d.   For such other legal and/or equitable relief as the Court deems appropriate.

RESPECTFULLY SUBMITTED,

HYSLIP & TAYLOR, LLC LPA

Date:  July 13, 2016                    By:____/s/ Jeffrey S. Hyslip_____
                                             One of Plaintiff's Attorneys

                                             Jeffrey S. Hyslip, Esq.
                                             Ohio Bar No. 0079315
                                             1100 W. Cermak Rd., Suite B410
                                             Chicago, IL  60608
                                             (P) (312) 380-6110
                                             (F) (312) 361-3509
                                             (E) jeffrey@lifetimedebtsolutions.com